# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                     Case No. 08-CR-231

DAVID R. MEDINA,

          Defendant.

_____

## ORDER

On September 3, 2008, a federal grand jury in the Eastern District of Wisconsin returned a three-count indictment against defendant David Medina ("Medina") and others. The defendant was charged in two of the three counts. In Count One, the defendant was charged with conspiring to distribute and possess with the intent to distribute five kilograms or more of a controlled substance in violation of 21 U.S.C. § 841(b)(1)(A) and 846, and 18 U.S.C. § 2. In Count Two, the defendant was charged with knowingly and intentionally distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2. The indictment also contains a forfeiture provision.

On April 14, 2010, the defendant appeared before United States Magistrate Judge William E. Callahan, Jr., for arraignment, entering a plea of not guilty. Then, on June 10, 2010, Medina filed a motion to suppress evidence as a result of the illegal search of his home. (Docket #84). This motion was amended on October 11, 2010. (Docket #93).

An evidentiary hearing was held on this motion on October 14, 2010, and continued on November 5, 2010. In moving to suppress evidence, the defendant asserted that law enforcement officers did not have consent to enter his home and did not have consent to search the home. At the hearing, the government acknowledged that law enforcement officers did not have consent to enter the home. However, the government asserts the law enforcement officers lawfully entered the home based on exigent circumstances. On January 13, 2011, United States Magistrate Judge Patricia J. Gorence issued a recommendation to this court that defendant's amended motion to suppress the evidence obtained during the initial entry and search of the bathroom be granted and the defendant's amended motion to suppress evidence obtained during the second search of the residence be denied. (Docket #120). Medina subsequently filed an objection to the Magistrate's recommendation. After *de novo* review of the motion, this court will adopt the recommendation in its entirety.

## BACKGROUND

On April 13, 2010, Special Agent Jeffrey Hale, DEA Task Force Officer (TFO) Ben Langer, and DEA Supervisory Special Agent Robert J. Bell were part of a team of approximately eight to ten law enforcement officers who were conducting surveillance on the defendant's residence. The purpose of the surveillance was to execute a federal arrest warrant for the defendant on drug charges. The agents arrived in the proximity of the home and began surveillance at approximately 2:30

p.m. They were in plain clothes, wearing bulletproof vests, and arrived in unmarked vehicles.

Special Agent Hale testified that earlier that day he had been "provided with a photograph of the defendant." (Tr. 1 at 11). He also testified that he was familiar with the defendant because his name had come up in prior investigations and he had seen the defendant before while conducting surveillance. (Tr. 1 at 12). At approximately 3:45 p.m., Agent Hale saw a green Infiniti vehicle – thought to be the defendant's – approach the residence and park at the curb across the street. Agent Hale and TFO Langer ordered the two occupants out of the car at gunpoint. The defendant was not in the car. The two occupants were ordered to the ground and handcuffed.

At this time, Agent Hale noticed a white Honda approaching. He recognized the car as belonging to Leah Moe ("Ms. Moe"), the defendant's girlfriend. He also noticed that Ms. Moe was driving the vehicle with another passenger in the front of the car. Special Agent Hale testified that he could not determine who the passenger was or if there were more people in the car. Special Agent Hale alerted Supervisory Agent Bell to the white Honda. Agent Hale testified that he asked Supervisory Agent Bell to handle the situation involving the white Honda and observed Agent Bell and TFO Langer stop the vehicle and order the occupants to exit the car. Supervisory Agent Bell testified that he and Agent Hale, not TFO Langer, approached the car and asked the individuals to identify themselves, detaining the two women, later identified as Ms. Moe and Alma Estrada. Ms. Moe was handcuffed. It is unclear whether Ms.

Estrada was handcuffed because she was pregnant. The two women were placed in a law enforcement vehicle while Agent Bell and the others went into the residence. Later, both women were brought inside the home. Other agents arrived at the scene and were located with the occupants of the green Infiniti.

At about the same time that he noticed the white Honda, Agent Hale saw two men emerge from the south side of the defendant's residence. He observed one man, later identified as the defendant's neighbor, Francis Daleccio, turn and walk away from the home. Agent Hale testified that the other man, later identified as Abraham Gutierrez, began to run toward the front door of the home. According to Agent Hale, he shouted for the man to stop, identified himself as police, and "ran after him." (Tr. 1 at 19).

Special Agent Hale testified that when he reached the front door, he found it slightly ajar and he ran through it, encountering a young teenager across the threshold. (Tr. 1 at 20). Special Agent Hale asked him where the man went and the teenager, later identified as Steven Estrada, did not respond. On the other hand, Steven Estrada testified that upon hearing noises outside, he and his uncle, Abraham Gutierrez, went outside to the front of the house and found no one there, so they went back inside. (Tr. 2 at 187). About five or six minutes later, he heard a knock on the door. When he answered it, he saw two men in vests, who he figured were police officers. He did not recall what they said, but they asked to speak with an adult and he turned to get one, leaving the door "open a little bit." (Tr. 2 at 185).

Steven Estrada then walked toward the kitchen to find his uncle. When he turned around, he noticed the officers had followed him into the home.

Though it is disputed how he came to be in the residence, once inside, Agent Hale testified that he saw the man he chased emerge from a small hallway. Agent Hale thought the man had come from the bathroom. Agent Hale immediately placed the man in handcuffs and took him outside.

Special Agent Hale testified that during his detainment of Gutierrez, he noticed that TFO Langer was also in the home with him. They conducted a protective sweep of the residence to search for other people and to ensure officer safety. As part of that sweep, Agent Hale entered the bathroom and noticed a whitish powder in the air. He also found a plastic bag resting on the toilet bowl and two plastic bags and a white powder in the toilet. Agent Hale took these bags as evidence as well as recovered a sample of the white powder residue.

All of the individuals detained during the incident were eventually brought into the residence. This included Gutierrez, Ms. Moe, Alma Estrada, the two men from the green Infiniti, the defendant's neighbor, Steven Estrada, and Gutierrez's two-year-old son. Everyone except Alma Estrada, Steven Estrada, and the two-year-old were in handcuffs and brought into the living room. After only a few minutes, Ms. Moe was taken into the kitchen. According to Agent Bell, the atmosphere in the living room was "under control and relaxed." (Tr. 1 at 69).

After Ms. Moe was taken from the living room, Supervisory Agent Bell testified that he and TFO Langer asked for her permission to search the residence. She did

not give consent at that time. Ms. Moe expressed concern that the others may overhear the conversation and be upset with her if she consented to the search because they also lived in the residence. Ms. Moe asked the agents several times why they were in her home and whether they had a warrant. Ms. Moe testified that the officers told her they would obtain a warrant if she did not consent and if they had to obtain the warrant, they would end up "tearing up the house, the walls." (Tr. 2 at 161).

The law enforcement agents asked Ms. Moe about the defendant's whereabouts several times and she explained he was at work and would not be home until five or five-thirty. At one point, she became "frustrated" and "put [her] head down. And just stayed quiet." (Tr. 2 at 165, 167). At another point, she became thirsty and one of the agents held a soda to her lips because she was in handcuffs. Ms. Moe testified that the agents kept saying they were waiting for Agent Jesus Sandoval, the case agent. (Tr. 2 at 167). Agent Bell testified that he planned to have Agent Sandoval speak with Ms. Moe regarding her consent to search and to get a search warrant if necessary. Around five o'clock, approximately one hour after the individuals were brought into the residence, Agent Sandoval arrived. He spoke with Ms. Moe. According to Ms. Moe, her conversation with Agent Sandoval was "rational" and "fairly low-key." (Tr. 2 at 175). At the end of the conversation (there is some disagreement over how long the two spoke), Ms. Moe agreed to permit the agents to search the residence. She was uncuffed so she could sign the consent form and then was placed back in handcuffs. This occurred around 5:25 p.m. The

agents proceeded to search the home. They left the residence at approximately 9:00 p.m or 9:20 p.m. The individuals detained in the residence remained in handcuffs until shortly before the law enforcement officers left.

After the search, TFO Langer prepared a written report. Agent Bell reviewed the report several times, but acknowledged at the hearing that the report contained some mistakes. (Tr. 1 at 80). The report contained a number of statements that were contrary to the testimony at the hearing. According to the report, Agent Hale knocked on the front door of the residence and received consent to enter from Steven Estrada. At the hearing, the government conceded that Agent Hale did not receive consent to enter the premises. The report reads that Agent Hale and TFO Langer entered the home together. In addition, the report does not indicate that any agent ran after an individual running into the home. The report also reads that Agent Sandoval arrived at the residence at about 3:55 p.m. but testimony indicates he arrived at approximately 5:00 p.m.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B), a magistrate judge may consider dispositive motions, such as motions to suppress, and issue recommendations to the district judge regarding the motions. *See id.* When a party objects to a magistrate's findings, the district court judge must make *de novo* determinations as to these findings. *See id.* § 636(b)(1)(C); *see also Delgado v. Bowen,* 782 F.2d 79 (7th Cir. 1986). The district court may adopt the recommendation in part or in its entirety and has the final authority of judgment in the case. *Delgado*, 782 F.2d at 82. If

necessary, the district court "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). The court has reviewed the evidence and finds it sufficient to make factual determinations on those records alone.

## ANALYSIS

The first issue for the court involves the initial entry into the residence by Special Agent Hale and the search of the bathroom that occurred following that entry.[1] The second issue is the search of the full residence that occurred later in the evening.

### I.    Initial Entry and Search of Bathroom

The government asserts that Agent Hale's initial entry into the residence and subsequent search of the bathroom were authorized under the exigent circumstances doctrine, arguing that Agent Hale had an objectively reasonably belief that the man he was chasing was attempting to destroy evidence. The government also contends that it was objectively reasonable to suspect that it was the defendant running into the house.  Additionally, the government avers Agent Hale's actions were justified because he was concerned about officer safety.

On the other hand, the defendant argues the initial entry by Agent Hale was unlawful and that the government has failed to establish the presence of exigent circumstances because it has presented no believable testimony supporting this

_____

[1]Neither party filed an objection regarding the magistrate's recommendation on the first issue.

contention. Furthermore, the defendant contends that even if Agent Hale's version of events is true, those facts still did not provide him with the requisite exigent circumstances to lawfully enter the residence. Lastly, the defendant asserts that even if exigent circumstances were present, the exigency was manufactured by the agents at the scene and, therefore, the warrantless home entry was not justified.

The Fourth Amendment protects individuals from all unreasonable searches and seizures and "has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). Absent probable cause and exigent circumstances, "that threshold may not reasonably be crossed without a warrant." *Id.*; *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). The exigent circumstances doctrine recognizes that a warrantless entry by law enforcement officials "'may be legal when there is compelling need for official action and no time to secure a warrant.'" *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). The government bears the burden of proving that its officials had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into a private residence. *United States v. Foxworth*, 8 F.3d 540 (7th Cir. 1993). The exigent circumstances doctrine requires a court to determine whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape. *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir. 1980).

Probable cause to support a search is established when, based on the totality of the circumstances, there is "sufficient evidence to induce a reasonably prudent

person to believe that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). Probable cause does not require certainty, but it does require more than a mere suspicion. *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990).

Discrepancies exist among the official written report detailing the events on the day of the search, the testimony presented on behalf of the government, and the testimony presented on behalf of the defendant. The official report states that Agent Hale and TFO Langer entered the home after knocking and receiving consent from a young teenager. Steven Estrada and Francis Daleccio testified that two agents knocked on the door, and Steven further stated that they followed him into the home when he responded to their request to get an adult. On the other hand, Agent Hale testified he ran straight into the home while following a man, and that he was alone when he did so. The government concedes, contrary to the written report, that Special Agent Hale did not receive permission to enter the home from Steven Estrada or anyone else. Therefore, the court is left to determine if exigent circumstances justified Agent Hale's entry into the home whether he ran into the residence after another man or whether he knocked and followed a young teenager into the residence. The court recognizes the merit of defendant's contention that the government has not met its burden in establishing exigent circumstances because it did not present believable testimony.[2] However, the court finds that any version

---

[2]The defendant's Brief in Support of his Motion to Suppress Evidence is rife with examples of the inconsistencies and discrepancies in the government's evidence.

of events propounded by either party did not provide the government with exigent circumstances to enter the home and, therefore, the court adopts Magistrate Gorence's recommendation granting the motion to suppress as to the initial entry and subsequent search of the bathroom.

First, though the agents had an arrest warrant for the defendant, an arrest warrant only "carries with it the limited authority to enter a dwelling in which the suspect lives when there is a reason to believe the suspect is within." *Payton v. New York*, 445 U.S. at 603; *Wilson v. Layne*, 526 U.S. 603, 611 (1999). When the agents first arrived on the scene, they did not enter the residence but instead circled the area and parked outside the residence, waiting for the defendant to "show up." (Tr. 1 at 12-13). The officers knew that a vehicle thought to be the defendant's was not at the residence at that time. (Tr. 1 at 13). Thus, it is reasonable to conclude that at this time, the agents had no reason to believe the defendant was inside the home.

Moreover, the agents also had no reason to believe the defendant was inside the home as events unfolded at the scene. Thus, the government may not rely on its theory that Agent Hale followed the man into the home because he reasonably believed it was the defendant to justify the home entry. The record indicates the following: Agent Hale knew what the defendant looked like from prior surveillance and a photograph. (Tr. 1 at 11-12). Agent Hale also testified that he did not know where the defendant was and that he did not know who the man was that ran into the residence. (Tr. 1 at 19). Accordingly, it is impossible to conclude that Agent Hale

had a reasonable belief that the man running into the home was the defendant. Thus, exigent circumstances did not exist on this basis.

The court also concludes that seeing a man run into a residence, without more, does not provide an objectively reasonable basis to believe that individual will destroy evidence. First, the record does not demonstrate that Agent Hale had any reason to believe there was evidence of any sort in the home, let alone that the man running inside would destroy that evidence. The only reasoning given by the government for Hale's belief that the individual may have been attempting to destroy evidence is that Agent Hale had been involved in hundreds of narcotics search warrants.[3] This argument does nothing to further the government's position. Agent Hale was at the residence to effectuate an arrest warrant, and nothing more. Though admittedly, that arrest warrant was based on a federal drug trafficking indictment, it does not necessarily follow that relevant evidence would be found in the residence. If that were the case, or if the agents' objectives were to search for relevant evidence, then the law enforcement agents should have attempted to obtain a search warrant in addition to the arrest warrant. Accordingly, the court finds the government has failed to establish an objectively reasonable fear of destruction of evidence and, thus, exigent circumstances did not exist on that basis.

---

[3]The government also appears to argue that Agent Hale had an objectively reasonable fear of destruction of evidence based on his observation of a powder mist in the air of the bathroom, plastic baggies resting on the toilet bowl, and a white residue in the bowl which he suspected to be cocaine, all of which he observed after entering the home. However, as the magistrate rightly noted, this argument is based on a misconception of the exigent circumstances doctrine. Whether an exigency exists must be evaluated at the time of the warrantless intrusion. *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994). Therefore, reliance on evidence found after the intrusion occurred cannot serve as a basis for application of the doctrine.

Lastly, the government attempts to justify Agent Hale's home intrusion by citing concerns over officer safety. While it is true that exigent circumstances exist where "there is a reasonable belief by police that their safety or the safety of others may be threatened," *United States v. Ware*, 914 F.2d 997, 1000-01 (7th Cir. 1990), here, the government has failed to establish a reasonable belief based on officer safety concerns. Agent Hale initially stated he followed the man into the residence over concerns for officer safety. (Tr. 1 at 19). When asked to elaborate, Agent Hale stated as follows:

> We had a lot of agents out on the street. There was a lot of chaos, I guess for lack of a better term. We had several individuals detained. We had one walking away from the residence. We had one running into the residence. Like I stated, I didn't know where [the defendant] was. I didn't know if the individual running into the house was [the defendant]. I wasn't quite sure what was going on. So for my safety as well as the other officers' safety, I ran in the house after him.

(Tr. 1 at 19). Though the court does not doubt the chaos of the scene, it cannot conclude that officer safety was an objectively reasonable excuse for Hale to enter the home. Agent Hale points to no specific reason why he believed the man running into the home posed any danger to himself or the other officers on the scene. The government also does not elaborate in this regard. Without more in the way of objective facts indicating a reasonable belief to fear for officer safety, the court finds that it was not reasonable to believe that a warrantless home entry was necessary to protect the safety of the officers at the scene. Accordingly, the court agrees with the magistrate's recommendation and report finding the government has not

established that exigent circumstances existed for the warrantless entry and all evidence obtained as a result of that entry must be suppressed.

## II.     Search of Full Residence

With respect to the second search of the full residence, the government asserts that Ms. Moe's consent to search the residence was voluntarily given. If found to be involuntarily given, the government contends that any evidence is still admissible under the "inevitable discovery doctrine." The government states that it had probable cause to support a search warrant for the residence in light of the bags and powder residue obtained from the bathroom as well as the fact that the house was occupied by the defendant – the subject of a federal drug trafficking indictment and arrest warrant – and thus, the evidence would have been discovered regardless of whether Ms. Moe consented.

The defendant responds by arguing Ms. Moe did not voluntarily consent to the search of the home because the consent was the product of duress and coercion. Specifically, the defendant asserts that Ms. Moe had been illegally arrested, detained in handcuffs for several hours, never advised of any constitutional rights, questioned repeatedly by different law enforcement agents in different parts of her home, told that the agents would tear up the house if she did not consent and a search warrant had to be obtained, and that the officer's physically coerced Ms. Moe to obtain the confession by keeping her in handcuffs and depriving her of liquids, except for a small sip of soda. Additionally, the defendant argues the evidence obtained after the

consent would not have been inevitably discovered because there was no probable cause to support a search warrant for the home.

"A warrantless search conducted pursuant to consent which is 'freely and voluntarily given' does not violate the Fourth Amendment." *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). The consent cannot be the product of "duress, coercion, or acquiescence to authority." *United States v. McGraw*, 571 F.3d 624, 628 (7th Cir. 2009). The government bears the burden of proving that consent was voluntary by a preponderance of the evidence. *United States v. Johnson*, 498 F.3d 536, 541 (7th Cir. 2007). Whether consent was voluntary is a "question of fact to be determined from the totality of all the circumstances." *McGraw*, 571 F.3d at 628 (quoting *Schneckloth*, 412 U.S. at 227). Factors bearing on this inquiry include:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.

*Id.* at 628-29.

There is evidence both supporting and weighing against a finding that consent was freely given. Ms. Moe is an adult, with unknown education, and the magistrate observed she "testified clearly and cogently in response to questions at the hearing." (Recommendation on Def.'s Mot. to Suppress Evidence at 17). The record also demonstrates that Ms. Moe was sophisticated enough to ask the agents several

times whether they had a search warrant for her home. Furthermore, Ms. Moe testified that she signed the consent form, fully understanding what the form meant, and following what she agreed was a "rational" and "fairly low-key" discussion with Special Agent Sandoval that lasted between twenty to forty-five minutes. (Tr. 2 at 175). The consent form stated that she freely consented to the search and that she was not threatened or coerced in any way. (Tr. 2 at 174). This signed statement is strong evidence of the voluntariness of Ms. Moe's consent. *See United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (noting signed consent form stating "I freely consent to this search" as a factor indicating voluntariness). However, the court notes that nowhere does the form advise Ms. Moe of her right to consult an attorney or her right to withhold or withdraw consent. *See United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992) (noting that signed consent form, informing defendant that she had a right to withhold consent, weighed heavily in favor of finding her consent voluntary). Yet here, as the court has previously noted, Ms. Moe was sophisticated enough to know the agents needed a search warrant. She also initially refused consent. Both are indicators that Ms. Moe was aware of at least some of her rights. All these factors greatly support a finding of voluntariness.

The magistrate's recommendation states that though Ms. Moe was detained in handcuffs for approximately one and one-half hours while at least three agents spoke to her before she gave consent to search, "the facts show that Ms. Moe was not questioned about her consent to search during this entire hour and one-half." (Recommendation at 17). However, the record clearly indicates that before Agent

Sandoval arrived and obtained consent, the agents attempted to obtain Ms. Moe's consent. Special Agent Bell testified that he and TFO Langer asked her for permission to search the residence, which she did not give, expressing fear that giving consent would put her in danger if the others in the residence found out. (Tr. 1 at 66). Moreover, Ms. Moe's testimony suggests that the agents asked repeatedly whether they could "look around." (Tr. 2 at 167-68). Therefore, there is no question that Ms. Moe was asked to consent to a search of the residence more than once. Ms. Moe contradicts Agent Bell's testimony regarding why she initially hesitated in giving her consent to the search. She states it was not for fear of her safety but rather simply because she did not want to upset the other renters in the home. (Tr. 2 at 164).

The fact that Ms. Moe was asked for consent at least once before Agent Sandoval arrived does not, under the circumstances, amount to the kind of duress or coercive tactic that would render the consent involuntary. *See Johnson*, 495 F.3d at 542 (finding that although officers requested more than once that defendant consent to search, in light of the totality of the circumstances, this did not amount to duress or coercion warranting a finding of involuntary consent). It does not appear that Ms. Moe was badgered or harassed for her consent. The record demonstrates that the agents asked her once for her consent at the scene. When she refused, they decided to wait for Agent Sandoval to arrive before making another attempt to obtain Ms. Moe's consent.

Weighing against a finding of voluntary consent, however, is evidence that Ms. Moe was questioned for up to an hour and a half before her consent was obtained, all while she was handcuffed.[4] Ms. Moe testified: "they kept asking me questions; and I would insist – I kept saying where is the warrant. Do you have a warrant. I don't understand why you're here. I'm in handcuffs. And they just kept telling me to hang tight. Answer my questions." (Tr. 2 at 161). It is clear that Ms. Moe was frustrated and confused about the circumstances she faced. (Tr. 2 at 165, 167). The length of time she remained in handcuffs and the prolonged and repeated questioning all weigh against a finding of voluntariness.

However, the questioning of Ms. Moe was not overly zealous or harassing in nature – other than that it was repetitive and prolonged. Furthermore, the rational and low-key conversation Ms. Moe had with Agent Sandoval appears to have been the real catalyst for her giving consent to the search. Therefore, the court finds she likely was not harassed or intimidated into giving consent by being asked more than once for consent, by being questioned, and by the fact that she was detained in handcuffs for over an hour. The court does not believe this constitutes the sort of repetitive psychological harassment or strong show of force that should tip the balance in favor of Ms. Moe.

---

[4]The defendant claims the detainment of Ms. Moe constituted an unlawful arrest, but he does not elaborate on this conclusion. The defendant further argues the magistrate failed to take this into account in determining whether Ms. Moe gave voluntary consent. Though neither party substantively addresses how to categorize Ms. Moe's detainment, it is clear that Ms. Moe was placed in handcuffs for the duration of the search of the residence. The court will consider this fact in its determination, but declines to categorize Ms. Moe's detainment in handcuffs as an unlawful arrest.

The court also finds the record devoid of any evidence of physical coercion. To go without fluids and to be handcuffed for an hour and a half could certainly be described as an uncomfortable situation. Yet, there is no indication that the agents directly intended to coerce Ms. Moe into consenting by keeping her in handcuffs and depriving her of fluids. Indeed, Ms. Moe was provided with a sip of soda when she told the officers she was thirsty. Under the circumstances, the court concludes there was no physical coercion involved.

The defendant asserts the agents threatened they would tear up the house if they had to obtain a search warrant rather than proceed with Ms. Moe's consent. However, it appears that it was only after Ms. Moe brought up her concerns that a search would tear up the house, that an agent then stated the house would not be torn apart so long as she agreed to the search. (Tr. 2 at 161). The defendant contends the magistrate erred by relying on confession law in finding that the agent's statements should not be construed as a threat because he was merely playing on Ms. Moe's fears and anxieties, not magnifying them. *See United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) ("the police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they are just not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible."). The defendant argues confession law is inapplicable here because Ms. Moe was not a suspect, but rather an innocent person, consenting to a search, not confessing to a crime. While the defendant's argument holds some logic, the court finds that reliance on the confession law standard for voluntariness

is appropriate when determining whether consent was voluntarily given. In both cases, the inquiry is whether the government or law enforcement has made it impossible for the individual consenting or confessing to make a rational choice as to whether to consent or confess. In confession cases, "if the government feeds the defendant false information that seriously distorts his choice, by promising him that if he confesses he will be set free, or if the government drugs him so that he cannot make a conscious choice at all, then the confession must go out." *Id.* Similarly, here, the court asks whether, by confirming that her house would likely be torn up if she failed to consent to a search, the agent deprived Ms. Moe of the ability to rationally decide whether to consent. The court finds that confirming her fear did not deprive Ms. Moe of the ability to make a rational decision. In fact, the agent's statement was probably not all that misleading. By consenting, Ms. Moe was able to place a condition on the extent of the search. Whereas, if the agents obtained a search warrant and the scope of the warrant allowed for it, the house may have been subject to some damage from a search. Thus, the court finds that Ms. Moe was not threatened and, even assuming the agent's statement impacted Ms. Moe's decision to some degree, the statement does not amount to coercion.

In sum, though there is some evidence weighing against a finding of voluntariness, the court concludes that the totality of circumstances supports a finding that the agents obtained consent to search the premises from Ms. Moe

voluntarily.[5]   Therefore, the defendant's amended motion to suppress evidence obtained as a result of the full search of the residence is denied.

Accordingly,

**IT IS ORDERED** that the January 13, 2011 recommendation of Magistrate Gorence (Docket #120) that defendant's amended Motion to Suppress Evidence Obtained as a Result of the Illegal Search of Medina's Home (Docket #93) be granted in part and denied in part be and the same is hereby **ADOPTED;**

**IT IS FURTHER ORDERED** that defendant David R. Medina's amended motion to suppress evidence obtained during the initial entry and search of the bathroom be and the same is hereby **GRANTED** and defendant's amended motion to suppress evidence obtained during the second search of the residence (Docket #93) be and the same is hereby **DENIED**.

Counsel for the parties are reminded of their joint obligation to contact the court with regard to further scheduling in this matter.

Dated at Milwaukee, Wisconsin, this 11th day of March, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[5]Because the court has found Ms. Moe's consent was voluntary, it is unnecessary to address the government's assertion regarding inevitable discovery. Even so, the court agrees with the magistrate that the government has not sufficiently established the applicability of the doctrine.